# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF OHIO

In Re: )
)                           **JUDGE RICHARD L. SPEER**
James Lee Smithey )
)                           Case No. 10-3129
Debtor(s) )
)                           (Related Case: 10-30310)
Frost & Co.,Inc., et al )
)
Plaintiff(s) )
)
v. )
)
James Lee Smithey )
)
Defendant(s) )

## DECISION AND ORDER

This cause comes before the Court after a Trial on the Plaintiffs' Complaint to Determine Dischargeability. The Plaintiffs' Complaint is brought pursuant to the statutory exceptions to dischargeability set forth in 11 U.S.C. § 523(a)(2) and § 523(a)(4). Respectively, these provisions operate to except from discharge any debt incurred by a debtor's fraud, and any debt arising from a debtor's misappropriation of another's property. At the Trial, the Parties were each given the opportunity to present evidence and make any arguments that they wished the Court to consider in reaching its decision.

At the conclusion of the Trial, this Court deferred ruling on the matter so as to afford the opportunity to thoroughly review the evidence presented, the arguments of the Parties, as well as the entire record in this case. The Court has now had this opportunity and, for the reasons now explained, finds that a determination of nondischargeability should be entered in favor of the Plaintiffs for the claims set forth herein.

## BACKGROUND

The Defendant and Debtor in this matter is James Lee Smithey (hereinafter the "Defendant"). For a number of years, the Defendant and the lead Plaintiff in this matter, John McCormick, were business partners, each owning a 50% interest in an Ohio company named Frost & Co., Inc. The Defendant and Mr. McCormick (hereinafter referred to individually as the "Plaintiff" in his individual capacity) were also corporate officers for Frost & Co.

In turn, Frost & Co. functioned as a holding and parent company for these three subsidiaries: (1) Frost Mechanical, Inc., which operated as a HVAC contractor; (2) Frost Roofing, Inc., which conducted business as a roofing contractor; and (3) Dick Nagel Electric, Inc., which operated as an electrical contractor. Historically, these businesses generated revenues in excess of $5,000,000.00 annually, with monthly disbursements averaging between $400,000.00 and $600,000.00. Frost & Co., Frost Mechanical and Dick Nagel Electric, Inc. are co-plaintiffs in this matter (hereinafter the plaintiffs will be referred to collectively as the "Plaintiffs").

The Plaintiff's father and the Defendant were the original owners of the above enterprises, having started doing business together in 1986. Circa 2003, the Plaintiff's father gifted to the Plaintiff his ownership interest in the above businesses. In his capacity as owner, the Plaintiff, who has a technical background, concentrated primarily on the business operations of Frost Mechanical while also obtaining and overseeing the worked performed by all the Parties' businesses enterprises. The Defendant concentrated his efforts with Frost Roofing, but also performed administrative day–to-day operations for all the businesses.

In 2004, the Defendant experienced a serious medical event. Gradually, thereafter, the business relationship between the Defendant and the Plaintiff began to deteriorate. The Parties' business operations also began to suffer so that by August of 2007 the major lender of the Parties' business operations, Chase Bank, required their participation in an asset management program. During this time, the Parties also began to explore a possible sale of one or more of their businesses to a third-party. No third-party purchase, however, was ultimately found.

Page 2

On September 1, 2006, the Defendant opened a savings account in his name at the Home Savings Bank of Wapakoneta with an initial deposit of $10.00. One week later, the Defendant electronically transferred $100,000.00 to this account. The source of these funds was the payroll account of Frost & Co., with this account being maintained with Chase Bank.

On September 21, 2006, the Defendant changed the ownership of the Home Savings Bank account to the name of Frost Roofing, Inc. The Defendant, however, remained the only authorized account signatory. Throughout the remaining months of 2006, additional deposits were made into the Home Savings Bank account so that, by year's end, the account had a balance of $633,448.87. The source of these funds was from the bank accounts maintained by Frost & Co., Frost Mechanical, Inc. and Dick Nagel Electric. (Pl. Ex. 4, 5, & 6).

During this same time, the Parties were negotiating a sale of the subsidiary, Frost Roofing, to the Defendant. It was the intent of the Defendant to leave the business to his son. An agreement for the sale of the business, through a stock purchase agreement, was eventually finalized. The actual sale of the business took place on January 12, 2007, but pursuant to the Parties' stock purchase agreement the sale was backdated so as to be deemed effective on September 30, 2006.

The terms of the sale provided that Frost & Co. would sell Frost Roofing to the Defendant for a purchase price of $1,375,000.00. (Pl. Ex. 1 & 23). As a part of the sale, a memorandum of understanding was executed by the Parties, in which the Plaintiff acknowledged that "some amount of money" was owned to the Defendant, but that the amount was disputed. (Doc. No. 38, Ex. B). The Defendant financed this transaction by paying $200,000.00, personally, with Chase Bank financing the remainder. The Parties agreed in the stock purchase agreement to waive any claims that may have had against the other.

Two checks were executed by the Defendant on the day of the transaction. First, from a personal account maintained by the Defendant and his wife, a check for $200,000.00 was made payable to Frost & Co. (Pl. Ex. 23). Second, a check signed by the Defendant for $200,000.00 was written from the account of Frost & Co. and made payable to Frost Roofing. *Id.* In addition, three

Page 3

days prior to the sale, the Defendant initiated a transfer of $613,448.87 from the Home Savings Bank account to the Chase Bank account.

Of the funds received by Frost & Co., approximately $950,000.00 went to retire debt it owed to Chase Bank; $225,000.00 was allocated to the Plaintiff personally; and $200,000.00 constituted reimbursement for a crane obtained by Frost Roofing. The remaining funds received by Frost & Co. were allocated to miscellaneous matters. *Id.*

Contemporaneous with the stock purchase agreement, the Defendant entered into an employment agreement with Frost & Co. (Pl. Ex. #2). Under this agreement, the Defendant would receive a salary of $150,000.00 per year as chief of operations for Frost Mechanical, Inc. Although not specified in the agreement, the Defendant was expected to continue doing work for Frost & Co. as well as Dick Nagel Electric. The employment agreement provided for the Defendant's termination if, with respect to Frost & Co. or any of its affiliates, the Defendant committed fraud, embezzled or misappropriated property, or was in gross neglect of his duties. (Pl. Ex. #2, ¶ 6).

As a part of the terms of the employment agreement, the Defendant was required to inform the Plaintiff of all expenditures in excess of $3,000.00, as well as any expenditures not in the ordinary course. (Pl. Ex. #2, ¶ 1). This particular term of the Defendant's obligation, however, was often breached, with the Defendant frequently issuing checks in excess of $3,000.00 and/or outside of the ordinary course.

In addition, the Defendant effectuated many intra-company transfers of funds which generally fall into two categories. First, from December 2006 through May of 2008 the Defendant signed checks payable to Frost Roofing in excess $321,000.00. The source of these funds was from accounts maintained by Dick Nagel Electric, Frost Mechanical and Frost & Co. (Doc. No. 38, Ex. G, H, & I). Second, from February 2008 through May 2008, the Defendant caused payments to be made from Frost Mechanical to Dick Nagel electric totaling approximately $414,000.00.

Page 4

As their business operations began to decline, the manner in which remittances to the Parties' businesses were handled also changed. It had been the practice of the Parties to have all their 'accounts receivable' made payable to Frost & Co., with the funds received deposited into an account maintained with Chase Bank. Once deposited, the funds in the Chase Bank account were then disbursed to the respective affiliates as required.

The account maintained with Chase Bank, however, was a "sweep account" whereby the funds in the account were automatically used to pay down a line of credit Frost & Co. maintained with Chase Bank. This arrangement eventually lead to cash-flow problems. Accordingly, to prevent their account from being "swept," some checks received were deposited into the accounts of the respective affiliates. Thereafter intra-company transfers between the accounts of the respective affiliates were often employed to satisfy accounts payable as needed. In December of 2007, the account with Chase Bank was closed after it was swept for $400,000.00.

In 2007, Dick Nagel Electric entered into a contract involving a municipal school project located in Marysville, Ohio. This project, worth in excess of two million dollars, was considered an anchor project for the Parties' businesses. Two persons, Lucas Nagel and Dean Klosterman, actively managed the project. Through the latter part of 2007, the Defendant made periodic inspections of the work site, but beginning in 2008, the visits stopped. Similarly, the Plaintiff did not regularly inspect the site.

For reasons not entirely clear, however, in 2008, Dick Nagel Electric became over budget and behind schedule on the municipal school project. Because of these deficiencies, both the Plaintiff and the Defendant eventually became personally and jointly liable on a surety bond issued by the Ohio Farmers Insurance Company. The amount of their joint liability totaled $338,000.00, with the Defendant subsequently reaching an accommodation with the insurance company to release him from liability in exchange for a payment of $169,000.00, representing half the total liability on the surety bond.

During the last months of 2007 and continuing into the first part of 2008, the Parties, after being unable to find a third-party purchaser for Frost & Co. entered into Reorganization Agreement. (Pl. Ex. 3). This agreement was executed on May 23, 2008, and operated to transfer to the Plaintiff, the Defendant's interest in Frost & Co., as well as it subsidiaries, Frost Mechanical and Dick Nagel Electric. The practicable effect of this transaction was to sever all business ties between the Parties.

In selling his interests in Frost & Co. and its subsidiaries, the Defendant represented in Section 5.5 of the agreement that, since January 1, 2008, Frost & Co. and its subsidiaries have not "suffered any Material Adverse Change." As consideration for the transfer of his interest in the above businesses, the Plaintiff agreed to pay the Defendant the sum of $115,000.00, evidenced by a cognovit promissory note. The Parties' agreement also provided for this additional consideration:

One, the Plaintiff agreed to assume and indemnify the Defendant on a line of credit in the amount $880,330.00. In order to accomplish this, the Plaintiff was required to borrow money from his parents. Two, the Plaintiff agreed to transfer to Frost Roofing a $91,000.00 loan owed by the Defendant to Frost & Co. Finally, the Plaintiff agreed to a general release of the Defendant for matters relating to the businesses purchased by the Plaintiff.

Not long after the Parties completed their transaction, the Defendant confessed judgment on the cognovit promissory note executed by the Plaintiff, alleging a default under its terms. In response, the Plaintiff sought to have the judgment set aside. The Plaintiff also commenced suits against the Defendant in state court in which a number of allegations were made.

These allegations included, but were not limited to the Defendant, as a principal in the business of Frost & Co., breaching his fiduciary duties, and committing acts of fraud, by misappropriating business assets for his own benefit. As a part of these allegations, the Plaintiff sought recovery of alleged fraudulent transfers made by the Defendant to family members.

The Plaintiff also alleged that the Defendant breached his employment agreement with Frost & Co. by failing to disclose expenditures outside the ordinary course and by failing to inform him

Page 6

of deficiencies in the operation of the business which eventually lead to the suit brought by the Ohio Farmers Insurance Company to recover on its surety bond.

On January 22, 2010, while the state-court litigation between the Parties was progressing, the Defendant filed a petition in this Court for relief under Chapter 7 of the United States Bankruptcy Code. On May 13, 2010, the Plaintiffs brought this action, seeking a determination that the claims they hold against the Defendant are nondischargeable debts.

Pursuant to their complaint, these claims, five in number, were represented to the Court as follows:

> Claim I: James Lee Smithey approved expenditures in excess of $3,000.00 and expenditures not in the ordinary course of business for Frost Mechanical, Inc. which constitutes fraud as a fiduciary and/or embezzlement and for which Plaintiffs object to his discharge of debt pursuant to Section 523(a)(4). (breach of the employment agreement).

> Claim II: James Lee Smithey initiated a series of checks and electronic fund transfers payable to Frost Roofing, Inc. and/or payable to persons/entities which were not legitimate corporate obligations and which constitutes fraud as a fiduciary and/or embezzlement and to which Plaintiffs object to his discharge of debt pursuant to Section 523(a)(4) and/or constitutes false pretenses, false representations, and/or actual fraud to which Plaintiffs object to his discharge of debt pursuant to Section 523(a)(2). (conversion of assets)

> Claim III: James Lee Smithey breached his fiduciary duty as an officer of Frost & Co., Inc., Frost Mechanical, Inc. and Dick Nagel Electric, Inc. by payments to persons/entities which were not legitimate corporate obligations and which constitutes fraud as a fiduciary and/or embezzlement and to which Plaintiffs object to his discharge of debt pursuant to Section 523(a)(4) and/or constitutes false pretenses, false representations, and/or actual fraud to which Plaintiffs object to his discharge of debt pursuant to Section 523(a)(2).

> Claim IV: James Lee Smithey had a duty to disclose material adverse changes and/or any liabilities not in the ordinary course of business incurred by Dick Nagel Electric, Inc. and pursuant to Section 5.5 of the Agreement of Reorganization effective May 23, 2008. The active misrepresentations made by James Lee Smithey as to the Marysville School project constitutes fraud

Page 7

as fiduciary and/or embezzlement and to which Plaintiffs object to his discharge of debt  pursuant to Section 523(a)(4) and/or constitutes false pretenses, false representations, and/or actual fraud to which Plaintiffs object to his discharge of debt pursuant to Section 523(a)(2).

Claim V: The establishment of the bank account at the Home Savings Bank, the $100,000.00 transfer from Frost & Co., Inc. payroll account and the series of deposits into the Home Savings Bank during the fall of 2006 by James Lee Smithy constitutes fraud as a fiduciary and/or embezzlement and to which Plaintiffs object to his discharge of debt pursuant to Section 523(a)(4) and/or constitutes false pretenses, false representations, and/or actual fraud to which Plaintiffs object to his discharge of debt pursuant to Section 523(a)(2).

(Doc. No.37 at pg. 2-3) The Trial on these claims was held over three days, commencing on May 8, 2012. (Doc No. 66).

## DISCUSSION

In this adversary proceeding, the Plaintiffs seeks to have their claims against the Defendant held to be nondischargeable debts. A proceeding brought to determine the dischargeability of a particular debt is deemed to be core proceedings pursuant to 28 U.S.C. § 157(b)(2)(I). Accordingly, this Court has the jurisdictional authority to enter final orders and judgments in this matter. 28 U.S.C. § 157(b)(1); § 1334.

The Plaintiffs' Complaint to Determine Dischargeability is brought under two statutory provisions: 11 U.S.C. § 523(a)(2)(A); and 11 U.S.C. § 523(a)(4). Respectively, these provisions provide:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt–

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by–

Page 8

> (A) false pretenses, a false representation, or actual fraud,
> other than a statement respecting the debtor's or an insider's
> financial condition;
>
> (4) for fraud or defalcation while acting in a fiduciary capacity,
> embezzlement, or larceny[.]

In order to prevail on their Complaint, and their five claims set forth therein, the Plaintiffs must establish the applicability of at least one of these provisions. For this burden, the evidentiary standard, as with other exceptions to dischargeability, is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (preponderance-of-the-evidence standard of proof applies to all of 523(a)'s exceptions).

All five of the claims brought by the Plaintiffs rely on § 523(a)(4) of the Bankruptcy Code as their basis for a finding of nondischargeability. As well, Plaintiffs' claims, designated two through five, cite to § 523(a)(2)(A) as an alternative basis to sustain a finding of nondischargeability. The Court will first address the applicability of § 523(a)(2)(A).

### 11 U.S.C. § 523(a)(2)(A)

In order to prevail on a claim under § 523(a)(2)(A), the Sixth Circuit Court of Appeals has held that a party must satisfy each of these elements: (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss. *Rembert v. AT & T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 280-81 (6th Cir.1998), *citing Longo v. McLaren (In re McLaren)*, 3 F.3d 958, 961 (6th Cir.1993). In this matter, Plaintiffs' claims two through four fail under the third element: reliance.

In *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), the Supreme Court of the United States addressed the reliance element of § 523(a)(2)(A). The question presented to the

Page 9

Court was the requisite "level of a creditor's reliance on a fraudulent misrepresentation necessary to place a debt . . . beyond release." *Id.* at 61, 439. On this question, the Court held that, although a creditor does not need to reasonably rely on a debtor's misrepresentations, their reliance must still be justifiable. *Id.* at 77, 447.

The difference between the two standards is that justifiable reliance employs a subjective interpretation, while reasonable reliance is based upon an objective reading. *Arndt v. Hanna (In re Hanna)*, 197 B.R. 413, 425 (Bankr. E.D.N.Y. 1996). As a result, justifiable reliance merely requires that a creditor act appropriately according to his individual circumstances. *Ozburn v. Moore (In re Moore)*, 277 B.R. 141, 149 (Bankr. M.D.Ga. 2002). This means that a party may justifiably rely on a misrepresentation even when the falsity of the representation could have been ascertained by an investigation. On the other hand, reliance is not justifiable if the creditor blindly turns their eyes away from things which would have clearly shown that any reliance on the debtor's representations was misplaced. *Id.*

On their action brought under § 523(a)(2)(A), the second and third of the Plaintiffs' claims are similar and aver that the Defendant committed fraud by causing payments to be made from the assets of the Parties' businesses which were not legitimate corporate obligations. The fourth of the Plaintiffs' claims is premised on the Defendant's fraudulent concealment of material facts as they relate to Dick Nagel Electric and the Defendant's sale of this business to the Plaintiff. For these allegations, the record simply does not support that the Plaintiff's reliance on any representations by the Defendant was justifiable under the circumstances as they existed.

In this matter, the Plaintiff acknowledged that he was provided with periodic accounting statements regarding his businesses. As well, the Plaintiff acknowledged that he had access to all business records, thus providing him with the ability to obtain the day-to-day financial condition and transactions being conducted by his businesses. The Plaintiff also testified that at no time did the Defendant ever refuse to provide him with financial information if and when it was sought.

Page 10

At the same time, the evidence also shows that the Plaintiff rarely, if ever, decided to avail himself of the opportunity to inspect the records of his businesses. If he had, many of the transactions for which the Plaintiff complains, – for example, the intra-company transfers – could have been easily gleaned from the reports. Furthermore, there is no justifiable basis for the Plaintiff's failure to investigate.

In the years leading up to the financial crises experienced by the Parties' businesses, the Plaintiff must have known of the overall financial difficulties facing the businesses. At the very least, the seriousness of the financial situation faced by the Plaintiff's businesses must have become apparent by August of 2007, when the major lender of the Parties' business operations, Chase Bank, required their participation in an asset management program. Yet, during this time, the Plaintiff's attention was not concentrated on the business affairs of Frost & Co. and its subsidiaries. In fact, for a time in 2007, the Plaintiff, while continuing to draw a salary from Frost & Co., obtained a full time job from a third party which required a considerable amount of the Plaintiff's time and attention.

Another matter is particularly perplexing to the Court. Up until the time of its sale, the Plaintiff did not undertake to actively inspect the municipal school project of Dick Nagel Electric. Yet, this project, being an anchor job, worth more than two million dollars, was undertaken in 2007 when the financial condition of the Parties' businesses were hanging in the balance. To be sure, the municipal school project was actively managed by other persons. However, to the extent this mitigates in the Plaintiff's favor, it also mitigates in the Defendant's favor who likewise did not visit the project in the months leading up to its sale to the Plaintiff, but nevertheless represented that the company had not "suffered any Material Adverse Change."

At the Trial, when pressed on these deficiencies, the Court found the Plaintiff to be elusive and, for lack of a better term, flummoxed. It was the Court's impression that the Plaintiff, being engaged in the technical aspects of the Parties' businesses, did not view financial matters to be within his sphere of concern.

In times where business operations are running well, the Plaintiff's lack of oversight could have possibly been viewed as justifiable. However, justifiable reliance cannot be said to exist where, as here, business operations have taken a turn for the worse, and a corporate officer and half owner of a business, who is aware of the financial predicament, continues to remain ignorant on matters which could have been easily discerned. In the words of the Supreme Court, when explaining justifiable reliance: "a person is required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Field v. Mans*, 516 U.S. at 71; 116 S.Ct. at 444 (internal citation omitted).

In opposition to this finding, the Plaintiff, rightly, raised an issue as to the bias of their accountant, James Stroh, with the evidence showing that he and the Defendant had a personal relationship – *e.g.*, they played golf together. However, in having had the opportunity to assess the credibility of Mr. Stroh, the Court could not discern any indication that Mr. Stroh would have been remiss in his professional duties to the Parties' businesses, and thus by implication to the Plaintiff. Moreover, no evidence was introduced that Mr. Stroh, either intentionally or unintentionally, engaged in conduct that would have lessened the Plaintiff's access to the condition of his businesses. As a result, whatever the relationship between Mr. Stroh and the Defendant, the Court is not inclined to ascribe to such a relationship a finding that the Plaintiff was deceived by Mr. Stroh as to the true financial condition of his businesses.

In sum, the Court cannot find that, with respect to the claims designated two, three and four, the Plaintiffs have sustained their burden of showing that their reliance on any representations made by the Defendant were justifiable. In coming to this conclusion, the Court was struck with the impression that the Plaintiff now seeks to ascribe blame to the Defendant for the deterioration of the Parties' businesses under the guise that he was misled. To the extent that blame is to be accorded, however, neither party, the Plaintiff nor the Defendant, is in a position to point fingers. In making this statement, a final point is in order.

Page 12

thereafter placing $100,000.00 of company funds into the account. Moreover, even after he changed the name on the account to Frost Roofing, the Defendant remained the sole signatory on the account. The Defendant's use of the account also coincides with the incident surrounding the $160,000.00 company check issued by the Plaintiff to himself, a fact which would tend to show a motive for the Defendant's reciprocal conduct.

In any event, this much is clear. On January 9, 2007, three days prior to the sale of Frost Roofing, the Defendant initiated a transfer of $613,448.87 from the Home Savings account to Chase Bank. On the day of the sale, the settlement statement shows that the Defendant personally contributed $200,000.00 to purchase Frost Roofing, with Chase Bank financing the remaining purchase price of $1,375,000.00. Contemporaneous with the purchase, two checks for $200,000.00 were issued by the Defendant: one from a personal account maintained by the Defendant and his wife, made payable to Frost & Co.; and a second check written on the account from Frost & Co. and made payable to Frost Roofing. *Id.*

Although a rather circuitous route, in the end these transactions convince the Court that the source of the $200,000.00 in funds used by the Defendant to purchase Frost Roofing came from Frost Roofing. In fact, the Defendant was unable to identify an independent source for the $200,000.00. Instead, the Defendant simply argued that the purchase price of Frost & Roofing had been increased to account for the transaction. Yet, even assuming this to be true, this does not mitigate against the fact that the Defendant used, without the Plaintiffs' knowledge, funds belonging to Frost Roofing to purchase Frost Roofing.

Based upon this conclusion, it easily follows that the Defendant's use of the $200,000.00 in funds from Frost Roofing satisfies the remaining three elements necessary to have a claim held nondischargeable under § 523(a)(2)(A). Accordingly, on their fifth claim, the Plaintiffs shall be entitled to a finding of nondischargeability in the amount of $200,000.00.

Page 14

While the issue of the Plaintiff's culpability is not an element of the Plaintiff's complaint to determine dischargeability, the Court does find one aspect of the Plaintiff's conduct particularly troublesome. The evidence shows that in September of 2006, the Plaintiff, after receiving a large check on behalf of Frost Mechanical, caused a check to be issued for over $160,000.00 to himself, in his personal capacity, from the account of Frost & Co. Such conduct is hardly indicative of a person who claims he was duped.

The Plaintiff's fifth claim, regarding the Defendant's establishment of a Bank account with the Home Savings Bank, however, does not so easily fit into the above mold. Instead, when considering these two circumstances, the Plaintiff's initial ignorance of this account must be considered justifiable: (1) the account was originally listed in the name of only the Defendant; and (2) even after the account was transferred to Frost Roofing, the Defendant remained the sole signatory on the account. Moreover, the circumstances surrounding this account are indicative of fraud.

For the Home Savings Bank account, the essence of the Plaintiffs' complaint is that the Defendant diverted company funds to this account, and then used $200,000.00 of such funds to purchase Frost Roofing from Frost & Co. In effect, the Plaintiff asserts that the Defendant, without disclosure to the Plaintiff, used the company funds of Frost Roofing to buy Frost Roofing.

It is evident to the Court that, to the extent the Plaintiff's allegation is true, the Defendant's use of the funds would have been wrongful given that, up until the time of the sale, the Plaintiff still maintained, through Frost & Co., a one-half interest in Frost Roofing. In assessing the evidence, the Court was unable to find a "smoking gun," given that the funds moving through the Home Savings Account of Frost Roofing were fungible up until the time of the sale of Frost Roofing to the Defendant. Nevertheless, the weight of the evidence does support the Plaintiffs' position.

To begin with, the Defendant's conduct regarding the Home Savings Bank account was anything but forthright, with the Defendant having opened the account in his name, and then shortly

Page 13

## 11 U.S.C. § 523(a)(4)

Each of the five claims brought by the Plaintiffs relies on § 523(a)(4) as a basis for a finding of nondischargeability. This provision applies to except from discharge any debt arising in one of these circumstances: (1) fraud or defalcation while acting in a fiduciary capacity; (2) embezzlement; and (3) larceny. The five claims raised by the Plaintiffs invoke the first two of these conditions. With the exception of the Plaintiffs' fifth claim, which has already been determined nondischargeable under § 523(a)(2)(A), each of the Plaintiffs' claims under § 523(a)(4) will be addressed in order. The Court, however, first begins with an analysis of the legal requirements underlying an action pursuatn to § 523(a)(4).

To hold a debt nondischargeable under the first condition set forth in § 523(a)(4), it must be shown that the debtor committed "fraud or defalcation while acting in a fiduciary capacity." Parties seeking to except a debt from discharge on this basis almost always rely on a debtor's defalcation, as opposed to fraud, while acting in a fiduciary capacity as this is a less stringent standard to satisfy.[1] *Carlisle Cashway, Inc. v. Johnson (In re Johnson)*, 691 F.2d 249, 257 (6th Cir.1982) ("subjective intent to violate a known fiduciary duty or bad faith is irrelevant."). The Court will not treat this case any differently.

The Sixth Circuit Court of Appeals has explained that a "debt is non-dischargeable as the result of defalcation when a preponderance of the evidence establishes: (1) a pre-existing fiduciary relationship, (2) a breach of that relationship, and (3) resulting loss." *Patel v. Shamrock Floorcovering Servs., Inc. (In re Patel)*, 565 F.3d 963, 968 (6th Cir. 2009). As applied to the first requirement, the Sixth Circuit set forth that the "term 'fiduciary relationship,' for purposes of § 523(a)(4), is determined by federal, not state, law." *Commonwealth Land Title Co. v. Blaszak (In*

---

[1]

It is also noted that the fraud aspect of the Plaintiffs' claims has already addressed in the prior discussion regarding § 523(a)(2)(A). The result would be no different if this Court were to now analyze whether the Defendant committed fraud from the perspective of the Plaintiffs' claims brought under § 523(a)(4).

*re Blaszak)*, 397 F.3d 386, 390 (6th Cir. 2005). In applying federal law, the Sixth Circuit then explained in *In re Blaszak*:

> this Court construes the term 'fiduciary capacity' found in the defalcation provision of § 523(a)(4) more narrowly than the term is used in other circumstances. For example, in In re Garver, we explicitly considered the nature of the fiduciary relationship required under the defalcation provision of § 523(a)(4), and held that § 523(a)(4) applied to trustees who misappropriate funds held in trust, and not to those who fail to meet an obligation under a common law fiduciary relationship.

*Id.* at 391 (internal quotation and citation omitted).

Within this framework, the Court *In re Blaszak* determined: "the mere failure to meet an obligation while acting in a fiduciary capacity does not rise to the level of defalcation; an express or technical trust must also be present. In sum, the defalcation provision of § 523(a)(4) is limited to only those situations involving an express or technical trust relationship arising from placement of a specific res in the hands of the debtor." *Id.* (internal quotations and citation omitted), *citing R.E. America, Inc. v. Garver (In re Garver)*, 116 F.3d 176, 178-79 (6th Cir.1997). By way of example, the Court *In re Blaszak* pointed out that the attorney-client relationship, without more, is insufficient to establish the necessary fiduciary relationship for defalcation under § 523(a)(4).

Although federal law controls, state law is important in determining when a trust relationship exists for purpose § 523(a)(4). *In re Johnson*, 691 F.2d at 251. In Ohio, corporate directors and officer occupy a position of trust in relation to his or her corporation. Based on this position, directors and officers have a fiduciary relationship to the corporation and its shareholders. *In re National Century Financial Enterprises, Inc., Inv. Litigation*, 617 F.Supp.2d 700, 718 (S.D.Ohio 2009) (under Ohio law "corporate officer or director has a fiduciary relationship to the corporation and carries a duty not to waste or mismanage corporate funds."), *citing Geygan v. Queen City Grain Co.*, 71 Ohio App.3d 185, 191, 593 N.E.2d 328, 331 (Ohio Ct.App.1991).

This fiduciary relationship requires that a director act "in good faith, in a manner the director reasonably believes to be in or not opposed to the best interests of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances." O.R.C. § 1701.59(B). This is known as the business judgment rule. Such a duty, however, does not give rise to an express or implied trust with a defined trust res. To the contrary, this Court, in the case of *Ronk v. Maresh (In re Maresh)*, held that O.R.C. § 1701.59(B), which as set forth above codifies Ohio's business judgment rule, does not create an express or implied trust. 277 B.R. 339, 348–50 (Bankr. N.D.Ohio 2001).

Since the decision in *In re Maresh* was entered, this Court is not aware, nor has it been able to find any authority under Ohio law for the position that a corporate officer or director, on account of their fiduciary role, hold corporate assets in an express or implied trust with a defined trust res.[2] Moreover, the Plaintiffs did not cite the Court to any authority to the contrary involving a corporate officer such as the Defendant. The Court must, therefore, suppose that no such authority exists, particularly considering that it is generally recognized that the "standard of care and conduct applicable to directors and officers has been held to be less exacting than the standard applicable to trustees because corporate rather than trust principles are applied in determining liability." Bogert's, The Law Of Trusts And Trustees § 481.1

In this case, for all five of the claims brought by the Plaintiffs, there was no independent assertion or evidence introduced as to the creation of an express or implied trust. Nor can such a trust be imposed upon a debtor, for those reasons explained, solely by virtue of his or her status as a director or officer of a corporation. Accordingly, since the precedent set by the Sixth Circuit Court of Appeals is settled on the issue – that an express or implied trust with a defined trust res must exist to maintain a claim for defalcation under § 523(a)(4) – the Court must find in the Defendant's favor

---

[2]

It can also be presumed that the same would apply for shareholders vis-a-vis other shareholders.

Page 17

on that portion of the Plaintiffs' claims concerning fraud and defalcation while acting in a fiduciary capacity.

Each of the five claims made by the Plaintiffs also make an assertion of embezzlement for purposes of § 523(a)(4). As it applies to § 523(a)(4), the Sixth Circuit has defined embezzlement as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172–73 (6th Cir.1996). To establish a claim for embezzlement under § 523(a)(4), these elements must be shown: (1) the creditor entrusted his property to the debtor; (2) the debtor appropriated the property for a use other than that for which it was entrusted; and (3) the circumstances indicate fraud. *Ball v. McDowell (In re McDowell)*, 162 B.R. 136, 140 (Bankr. N.D.Ohio 1993). Because an embezzler first comes into embezzled property legally, a claim for embezzlement, unlike a claim for fraud under § 523(a)(2)(A), does not require that a creditor rely on any representations made by the debtor. With the exception of the fifth, each of the Plaintiff's claims will now be examined within this framework.

The Plaintiffs' first claim for embezzlement holds that the Defendant wrongly approved expenditures in excess of $3,000.00 and expenditures not in the ordinary course of business for Frost Mechanical. On this claim, the Defendant was forthright that on numerous occasions, during his approximately two-year tenure as an employee of Frost Mechanical, he wrote checks in excess of $3,000.00 as well as checks which could be construed as outside the ordinary course of business. It is the Defendant's contention, however, that such checks were written for legitimate business purposes, and thus the expenditures cannot be considered an embezzlement of company funds.

For the most part, the Court agrees with the Defendant's assessment. While the exact nature of every expenditure made by the Defendant is not capable of being ascertained with the evidence before the Court, the overall circumstances of this case do not indicate that the Defendant, as an employee of Frost Mechanical, embezzled funds.

Page 18

**Frost & Co., Inc., et al v. James Lee Smithey**
**Case No. 10-3129**

First, Frost & Co. and its affiliates, including Frost Mechanical, had monthly disbursements ranging from $400,000.00 to $600,000.00. It would, thus, not seem out of the ordinary for there to be disbursements exceeding $3,000.00, as well as non-ordinary course payments. It also did not go unnoticed that the Defendant's employment agreement with Frost Mechanical gave the Plaintiff the power to terminate him if the Defendant engaged in any dishonest conduct such as embezzling property. No such action, however, was ever undertaken by the Plaintiff. In this regard, it can be presumed that had the Defendant not been handling the 'accounts payable' for Frost Mechanical in a proper manner, such a fact would have come to the Plaintiff's immediate attention. For example, if the Defendant did not properly pay vendors and employees, the Plaintiff would have certainly received notice of this fact.

Finally, for most of expenditures made by the Defendant, the Plaintiffs were unable to point the Court to a specific instance of an improper payment. This point is critical as it is the Plaintiffs who carry the burden to establish their claim for embezzlement under § 523(a)(4). Notwithstanding, in three specific instances, the Plaintiffs did point the Court to unusual transactions.

First, in 2008, business assets were used by the Defendant to pay for personal legal services in the amount of $24,994.36. (Pl. Ex. # 31). Second, in February of 2008, the Defendant used company funds, totaling $8,856.76, to pay for a country club membership. (Pl. Ex. # 18). Finally, before the employment agreement was executed, two invoices submitted as evidence – one totaling $8,980.00, the other totaling $7,120.00 – show that the Defendant used business funds for painting work at his home. (Pl. Ex. # 17).

These transactions have what the Court considers a strong indicia of embezzlement: an appropriation of company property for personal use. Once more, for the last two expenditures, the Defendant was unable to provide any cohesive justification for the transactions. As such, the Court must conclude that such transactions constitute embezzlement within the meaning of § 523(a)(4).

Page 19

For the first transaction regarding attorney fees, it is the position of the Defendant that such an expenditure was warranted pursuant to the memorandum of understanding executed by the Parties. However, in looking at Parties' memorandum of understanding, nothing in it specifically provides the Defendant with authority to use company funds to pay for personal attorney fees. Instead, it only provides that "some amount of money" was owned to the Defendant, but that the amount was disputed. Consequently, when set against the other two transactions for which a finding of embezzlement has already been made, the Court can discern no basis why a different result should be accorded to this transaction.

Accordingly, on the Plaintiffs' first claim, the Court holds that a finding of nondischargeability under § 523(a)(4) is appropriate for the three transactions just delineated. However, for those other transactions involving expenditures in excess of $3,000.00 and outside of the ordinary course of business, the evidence before the Court is not sufficient to sustain a finding of nondischargeability. This is not to say that the Defendant did not breach his employment agreement with Frost Mechanical. Instead, this conclusion only means that the evidence before the Court does not warrant a finding in favor of the Plaintiff under § 523(a)(4).

The second and third claims brought by the Plaintiffs raise questions as to the efficacy of the intra-company transfers made by the Defendant. The first group of these transfers occurred from December 2006 through May of 2008 when the Defendant executed various checks, totaling $321,000.00, from Dick Nagel Electric, Frost Mechanical and Frost & Co. to Frost Roofing. The second group of transfers took place from February 2008 through May 2008, when the Defendant caused payments to be made from Frost Mechanical to Dick Nagel Electric, totaling approximately $414,000.00. For these groups of transfers, the second must be adjudicated in the Defendant's favor.

The evidence in this case shows that in December of 2007, Chase Bank swept the operating account of Frost & Co. in the amount of $400,000.00, leading to critical cash flow problems for the Parties' business operations. It is the Defendant's position that after this event, to keep the Parties' business operations running, he could no longer allow funds to be deposited into the Frost & Co.

account less the funds be swept. As a result, the Defendant contends that he was forced to do intra-company transfers between affiliates to handle the operation of the Parties' businesses.

Such a response, although it could have implications with Chase Bank, does not indicate that the Defendant was not paying otherwise legitimate business obligations. Of import, the transactions at issue went from Frost Mechanical to Dick Nagel Electric at a time when Dick Nagel Electric was in the midst of a major project. Thus, nothing strikes this Court as nefarious that funds from Frost Mechanical would have to be used to handle the ebbs and flows in the 'accounts payable' of Dick Nagel Electric.

Moreover, since these transactions involved transfers from Frost Mechanical to Frost Roofing, the Defendant did not benefit from these transactions at the expense of the Plaintiff. Hence, there is no hint of self dealing with respect to these transactions. In this way, since the Plaintiff was personally liable for any obligations incurred by Dick Nagel Electric – a fact which became readily apparent later when liability was imposed against the Plaintiff on a surety bond – it must be concluded that the Plaintiff benefitted from the transfers made from Frost Mechanical to Frost Roofing.

The first group of transfers, however, do have an air of self dealing. These transfers, totaling $321,000.00, were made directly to Frost Roofing at time when the Defendant was the sole owner of the company. Moreover, given the large amount of the transfers, they are beyond that which Frost Roofing may have been entitled to charge for administrative matters, particularly considering that the Defendant was already receiving an annual salary of $150,000.00 as chief of operations for Frost Mechanical.

At the same time, the Court does not have any evidence before it which would tend to show that such transfers were not legitimate. Critically, unlike those other transactions discussed earlier, there is nothing definitive before the Court which would indicate the Defendant used the funds

Page 21

received by Frost Roofing for his personal use. Consequently, since it is the Plaintiffs who carry the burden of proof on the matter, the Court must find in favor of the Defendant.

The fourth claim brought by Plaintiffs is premised on the Defendant's fraudulent concealment of material facts as they relate to Dick Nagel Electric and the Defendant's sale of this business to the Plaintiff. This assertion, however, does not involve essential aspects of a claim for embezzlement, such as whether the Defendant appropriated property of the Plaintiffs for a use other than that for which it was entrusted. Consequently, the Plaintiffs' fourth claim cannot be sustained on the basis of embezzlement under § 523(a)(4).

In summation, the Court, based upon all the evidence presented in this case, finds that the Plaintiffs should prevail on two of their claims. First, pursuant to 11 U.S.C. § 523(a)(2)(A), the Defendant's use of $200,000.00 in assets from Frost Roofing to accomplish a purchase of Frost Roofing qualifies as a nondischargeable debt. Second, pursuant to 11 U.S.C. § 523(a)(4), the Plaintiffs shall be deemed to hold a nondischargeable debt in the amount of $49,951.12, representing business assets wrongly used by the Defendant for personal use; to wit: legal services of $24,994.36; a country club membership of $8,856.76; and painting work of $16,100.00.

In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this Decision.

Accordingly, it is

**ORDERED** that, pursuant to 11 U.S.C. § 523(a), the Plaintiffs are hereby deemed to hold a nondischargeable debt against the Debtor/Defendant, James Lee Smithey, in the amount of $249,951.12.

**IT IS FURTHER ORDERED** that, pursuant to Bankruptcy Rule 9021, the Clerk, United States Bankruptcy Court, shall issue a judgment entry in favor of the Plaintiffs in accordance with the above order.

Dated: July 6, 2012

Richard L. Speer
United States
Bankruptcy Judge

Page 23

# CERTIFICATE OF SERVICE

Copies were mailed this 6th day of July, 2012 to:


Dick Nagel Electric, Inc.
9 Broadway
Wapakoneta, OH 45895

Frost & Co.,Inc.
9 Broadway Street
Wapakoneta, OH 45895

Frost Mechanical, Inc.
9 Broadway
Wapakoneta, OH 45895

John T. McCormick
1004 Hickory Circle
Wapakoneta, OH 45895

Derek A Younkman
101 N. Elizabeth St, 6th Floor
Lima, OH 45801

Bruce C French
PO Box 839
Lima, OH 45802

James Lee Smithey
16260 Nottingham Dr
Wapakoneta, OH 45895

Randy Lee Reeves
973 W North St
Lima, OH 45805

_____/s/Diana Hernandez_____
Deputy Clerk, U.S. Bankruptcy Court
